

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00854-CR

Romeo **HINOJOSA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2011-CRM-635-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by: Patricia O. Alvarez, Justice

Sitting: Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: May 7, 2014

AFFIRMED

Appellant Romeo Hinojosa filed a motion for rehearing alleging error in this court's opinion. Specifically, Hinojosa complains of factual assertions contained within the opinion. This court's opinion and judgment dated March 5, 2014 are withdrawn. This opinion, clarifying the factual assertions and reasonable inferences therefrom, and judgment are substituted in its stead. Hinojosa's motion for rehearing is denied.

**BRIEF OVERVIEW**

Appellant Romeo Hinojosa, along with co-defendants Carlos Zambrano and Abraham Linares, was charged with second-degree aggravated assault with a deadly weapon and first degree aggravated kidnapping of Nestor Abundez. Hinojosa was charged as a primary actor and as a party to the offense. Hinojosa was found guilty on the aggravated kidnapping and not guilty on the charge of aggravated assault with a deadly weapon. The jury assessed punishment at fifteen years confinement in the Institutional Division of the Texas Department of Criminal Justice and assessed a $10,000.00 fine on the aggravated kidnapping charge.

On appeal, Hinojosa argues (1) the evidence is legally insufficient to prove that Hinojosa committed the offense of aggravated kidnapping because there was no evidence that Nestor Abundez was secreted; (2) the evidence presented at trial is insufficient based upon a variance between the offense alleged in the indictment and the jury charge; and (3) the State's comments during closing argument were improper and outside the scope of permissible jury argument and violated his right to a fair trial. We disagree and affirm the judgment of the trial court.

**FACTUAL BACKGROUND**[1]

## A. The Arrest

At approximately 2:00 a.m., on May 2, 2011, Webb County Deputy Gerard Pecina was patrolling Highway 359 when he witnessed a green Expedition SUV traveling in excess of the marked speed limit. Deputy Pecina proceeded to follow the SUV into a subdivision, and ultimately initiated a stop. The SUV eventually came to a stop at a Valero gas station. Deputy Pecina testified that Hinojosa, the driver of the SUV, immediately exited the vehicle and began to approach Deputy Pecina's vehicle. When Deputy Pecina demanded identification, a very nervous Hinojosa

---

[1] All three defendants were tried together before one jury. Accordingly, the facts in this opinion, as well as the facts set forth in the opinions of Carlos Zambrano and Abraham Linares, are identical.

provided a Texas identification card. Based on Hinojosa's ediginess, Deputy Pecina ordered Hinojosa to wait by the front of the vehicle while Deputy Pecina attempted to identify the three other individuals in the SUV—Zambrano, Linares, and Abundez.

Sergeant Sanchez testified that when he arrived to assist Deputy Pecina, Hinojosa was already in the back of Deputy Pecina's vehicle. Pat-downs were conducted on the other men. Before starting the pat-down on Abundez, however, Abundez informed Deputy Pecina that he did not know the other individuals and that they had kidnapped him with a gun.[2] Deputy Pecina testified that Abundez appeared scared, frightened, and nervous. Sergeant Sanchez separated Abundez from the others and placed him in the back of his patrol car. Abundez then related to Sergeant Sanchez what happened, including being taken from his residence at gunpoint, that the firearm was thrown from the SUV by one of the men, and where it was thrown. Deputy Pecina headed to the location where the gun was allegedly thrown and found a weapon, a loaded handgun magazine, and a gray-colored cell phone.

Zambrano, Hinojosa, and Linares were placed under arrest for the aggravated kidnapping of Abundez. Zambrano, Linares, and Hinojosa, were each charged with second-degree aggravated assault with a deadly weapon and first-degree aggravated kidnapping. All three individuals were tried together and the jury trial began on Monday, October 15, 2012.

**B.      The Trial**

*1.      Nestor Abundez's Testimony*

The State's first witness was Abundez. Abundez testified that about 1:00 a.m. on May 2, 2011, he and his family, along with his brother's family, were at his house in Laredo, Webb County, Texas. Abundez testified that he went outside to investigate loud noises and saw a white

---

[2] We note that neither Abundez, nor any of the defendants, spoke English. The officers' testimony included their translation of witnesses' statements. At trial, victim and witness statements were offered via a translator.

Ford truck and two individuals honking the horn. When Abundez's wife walked outside their home with Abundez's cell phone, Abundez took the phone and instructed her to return to the house. Although he had never seen the two men before, Abundez walked towards the truck. According to Abundez, once he approached the truck, Zambrano struck him in the head with the handle of the pistol and then forced him into the vehicle. Although Abundez testified that Zambrano and Linares referred to the driver as "the cousin," he could not identify the individual driving the truck. At some point during the evening, Abundez was transferred to the Expedition. Abundez was able to identify Hinojosa as the driver of the Expedition. Abundez testified that while Hinojosa drove, Zambrano held a gun to him.

Abundez further testified that Zambrano, Linares, and Hinojosa were apparently looking for another individual named Pelon, a nickname for someone who is bald. Abundez, who was also bald, explained that he and his family had only lived in the house for a short period of time and to his knowledge, a person called Pelon lived in the house prior to Abundez.

During cross-examination, defense counsel suggested Abundez knew the two assailants and that all three men went to Linares's house to party and smoke marijuana when a fight broke out. Abundez denied knowing any of the individuals involved in the incident. After questioning by defense counsel, Abundez acknowledged he had his cell phone prior to Zambrano and Linares taking it, but explained that he was too nervous to call anyone or use the phone. Defense counsel also argued the weapon actually belonged to Abundez and that it was thrown from the Expedition by Abundez. Abundez, however, denied owning or throwing the firearm located by Deputy Pecina.

### 2. *Christian Abundez's Testimony*

Abundez's brother, Christian Abundez, testified that after seeing his brother forced into the white truck, he grabbed his keys and started chasing the truck. At some point, the truck stopped

at a creek and both Linares and Zambrano exited the vehicle. According to Christian, Linares hit him (Christian) in the back and Zambrano threatened him with a gun. Christian also testified a third person was driving the truck, but he could not identify the driver of the truck or how many men were in the truck. At Abundez's request, Christian left to find their older brother, Jose.

Once Christian found Jose, they went back to the creek but no one was there. After driving around the area trying to find Abundez, they saw the commotion at the gas station. When questioned by defense counsel, Christian acknowledged seeing the same white truck, which had been in front of Abundez's residence and the one he had chased earlier, at the gas station, but did not notify the officers.

### 3.    Sergeant Rolando Elizalde's Testimony

Although none of the defendants testified at trial, Sergeant Rolando Elizalde Jr. testified about the defendants' interviews taken shortly after their arrest.

With regard to Hinojosa's interview, Sergeant Elizalde testified Hinojosa told him that he was awakened by Linares, his son-in-law, at approximately 1:00 a.m. Hinojosa explained he was simply driving Linares and Zambrano around because he did not want Linares to get a ticket for the dark tint on his vehicle. Hinojosa also relayed that he did not know Abundez's name or anything about him and that the other men called him "mojadito" or wetback. During cross-examination, Sergeant Elizalde acknowledged that Hinojosa seemed surprised the three were being held on kidnapping charges and asked the officer whether it was the "mojadito" that was making the allegation. Hinojosa also described the others as drunk.

While interviewing Hinojosa, Sergeant Elizalde observed that Hinojosa was very calm, but extremely concerned that his wife have access to the impounded truck so that she could be at work the following day. According to Sergeant Elizalde, it appeared to him that Hinojosa was more concerned about his truck being impounded than with the kidnapping charges.

Sergeant Elizalde next relayed specifics about his interview with Linares. Sergeant Elizalde testified that Linares told him that "they had been partying, that they went and picked [Abundez] up and they were partying." In contradiction to Hinojosa's statement, Sergeant Elizalde interpreted Linares's statement to mean that Hinojosa, Zambrano, and Linares had gone to pick up the victim together. As to his presence at the gas station, Linares explained they were meeting another person at the gas station and that Abundez had only been with them for a short period of time when they were stopped by the deputy.

Sergeant Elizalde further testified that immediately after beginning the interview, Linares told the officer that he was a confidential informant for other officers and that he wanted to talk in exchange for a "deal." Sergeant Elizalde described Linares as fidgety, always moving his legs, and at times crying. During testimony, Sergeant Elizalde described Linares as "look[ing] like a drug addict, fidgety and nervous."

Based on Linares's statement, Sergeant Elizalde testified that he requested a patrol officer travel to the area identified by Linares as the location of the party. But once there, the officer did not find any evidence that a party had taken place. Sergeant Elizalde further explained that he even went back to the area the following day, but he likewise did not see any evidence suggesting a party.

On cross-examination, Sergeant Elizalde acknowledged Abundez was never searched because Abundez reported the kidnapping before the officers conducted the pat-down. Defense counsel also extensively questioned Sergeant Elizalde as to why the weapon was not fingerprinted arguing that it was the officers' failure to fingerprint the firearm that negated their ability to rule out Abundez as the owner of the firearm.

Regarding Zambrano's interview, Sergeant Elizalde testified Zambrano told him that "they were partying" at Hinojosa's and Linares's house that evening. Contrary to Hinojosa's timeline,

Zambrano told Sergeant Elizalde that "they" began partying around 10:00 p.m. and then went cruising to Los Presidentes and Southgate. Zambrano did not mention another driver or returning to the house to pick up Hinojosa as a driver. To the contrary, Zambrano told the officer that "they" all ended up at "the ranch" and that was where they picked up Abundez. This portion of Zambrano's statement was corroborated by Hinojosa's account of leaving his residence with Zambrano and Linares.

During cross-examination of Sergeant Elizalde, defense counsel suggested that Zambrano was very drunk when he was arrested and that he had denied using the firearm. Sergeant Elizalde testified that although Zambrano acknowledged knowing about the weapon, he never admitted ownership of the weapon. Once again, defense counsel attacked the officers' failure to fingerprint the firearm and Sergeant Elizalde indicated that Deputy Pecina made the decision whether to request fingerprint analysis. Additionally, in response to questioning by defense counsel, Sergeant Elizalde acknowledged that several rounds of ammunition were located in the impounded SUV, however they were a different caliber than the firearm collected by Deputy Pecina.

As a conclusion, Sergeant Elizalde reiterated that all three men spoke to him voluntarily. He opined, however, that Hinojosa's, Linares's, and Zambrano's statements were conflicting and none of the interviews matched each other.

4. *Deputy Gerard Pecina's Testimony*

Deputy Pecina's testimony included his initial stop of the vehicle and his actions in locating the firearm. Similar to the cross-examination of Sergeant Elizalde, defense counsel probed Deputy Pecina's rationale for failing to submit the firearm for fingerprint analysis. Deputy Pecina explained that he did not submit the firearm for testing because the location where it was found corroborated what Abundez, the victim, had reported. He continued that he was working an abduction case, the victim identified the individuals, and he did not have any reason to believe

analysis on the weapon would assist in the prosecution. Deputy Pecina acknowledged that no one requested the gray cell phone be fingerprinted or that additional tests be performed.

## C.      The Jury Verdict

Hinojosa was found not guilty of aggravated assault with a deadly weapon and guilty of the aggravated kidnapping. The jury assessed punishment at fifteen years confinement in the Institutional Division of the Texas Department of Criminal Justice and assessed a fine in the amount of $10,000.00. This appeal ensued.

SUFFICIENCY OF THE EVIDENCE

Hinojosa alleges the evidence is insufficient to prove that he committed the offense of aggravated kidnapping with a deadly weapon. Hinojosa asserts (1) there is no evidence that he abducted Abundez or that he knew a gun was being used during the commission of the alleged offense and (2) even though he was driving the vehicle, there is no evidence that he knew the offense was occurring. The State contends there is more than sufficient evidence that Hinojosa was guilty under a party-liability theory and that the jury could infer that he knew and acted in accordance with a plan to abduct Abundez at gunpoint. The State also argues that Hinojosa's presence in the vehicle (1) while Abundez was being held, (2) while Christian Abundez was hit with the weapon, and (3) while the weapon and cell phone were thrown from the SUV, all point to Hinojosa's culpability. We agree with the State.

## A.      Standard of Review

In reviewing the legal sufficiency of the evidence, an appellate court determines whether, viewing "all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *accord Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We must defer to the

jury's assessment of the credibility of the witnesses "and the weight to be given to their testimony," *Brooks*, 323 S.W.3d at 899, and allow for reasonable inferences from the evidence presented. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) (stating that "the jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony" except where provided otherwise by law); *Jackson*, 442 U.S. at 319 (reiterating it is strictly the province of the jury "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). In so doing, an appellate court presumes that the jury "resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

The key question is whether "the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *See Williams*, 235 S.W.3d at 750. Only upon a finding the evidence is legally insufficient will this court reverse the trial court's judgment and order an acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41 (1982). This legal sufficiency standard applies equally to both direct and circumstantial evidence. *Clayton*, 235 S.W.3d at 778; *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

**B.    Aggravated Kidnapping**

In the present case, Hinojosa was charged both as a primary actor and as a party to the offense. Whether a person is charged as a primary actor or as a party to the offense, the underlying offense of aggravated kidnapping remains the same.

A person commits the offense of aggravated kidnapping if he intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense. *See* TEX. PENAL CODE ANN. § 20.04(b) (West 2011). For purposes of this statute, abduct "means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place

where he is not likely to be found; or (B) using or threatening to use deadly force." *See id.* § 20.01(2). Restrain "means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). Restraint is "without consent" if "accomplished by force, intimidation, or deception." *Id.* § 20.01(1)(A); *see also Holmes v. State*, 873 S.W.2d 123, 126 (Tex. App.—Fort Worth 1994, no pet.) (explaining that "[c]onfining is not defined in the Penal Code or by case law; thus, we use its common meaning when reviewing the evidence," which may include shutting up, imprisoning, enclosing, detaining, relegating to certain limits, or trapping victim).

To convict Hinojosa under the law of parties, the jury had to determine that Hinojosa was criminally responsible for the acts of another. TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* Section 7.02(a)(2) of the penal code provides that a "person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). Generally, the trial court may instruct the jury on the law of parties if "there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). The court may consider the events that took place before, during, and after the commission of the crime. *See Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Goff v. State*, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996). Additionally, allegations that a party is guilty under the law of parties need not be specifically pled in the indictment. *Barrera v. State*, 321 S.W.3d 137, 144 n.1 (Tex. App.—San Antonio 2010, pet. ref'd).

**C.     Charge of the Court**

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Because Hinojosa does not contend error in the trial court's "secreted" language, we look directly at the language contained within the trial court's jury charge.

*1.     Instructions Contained within the Court's Charge*

The trial court's charge provided the following instruction:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

> Each party to an offense may be charged with the commission of the offense.

> A person is criminally responsible for an offense committed by the conduct of another, if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

> A defendant's mere presence alone will not make him responsible for an offense. A defendant's mere knowledge of a crime or failure to disclose a crime also is not sufficient.
>     . . . .

*2.     Application Paragraph of Court's Charge*

To convict Hinojosa of aggravated kidnapping, the trial court's charge required the jury to find the following:

V.

> You must determine whether the State has proved the defendant(s) committed the crime by his own conduct. To prove this, the State must prove, beyond a reasonable doubt, three elements. The elements are that–

> 1. On or about the 2nd day of May 2011, in Webb County, Texas, Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano, caused the abduction of an individual, Nestor Abundez, by restricting his

movement with the intent to prevent his liberation by secreting him or holding him in a place where he was not likely to be found;

2. During the commission of the abduction Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano, used or exhibited a deadly weapon; and

3. Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano, did this intentionally or knowingly.

## VI.
### Application, Liability as a Party

Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that

1. On or about the 2nd day of May 2011, in Webb County, Texas, Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano, acting alone or as a party (a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both) caused the abduction of an individual, Nestor Abundez, by restricting his movement with the intent to prevent his liberation by secreting him or holding him in a place where he was not likely to be found;

2. During the commission of the assault, Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano used or exhibited a deadly weapon;

3. Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano did this intentionally or knowingly; and

4. Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano acted, solicited, encouraged, directed, aided, or attempted to aid with the intent to promote or assist the commission of the offense of Aggravated Kidnapping, First Degree Felony, by Abraham Linares, Romeo Hinojosa, and/or Carlos Zambrano then you must say by your verdict "guilty."

If you find that the State did not prove each of the first three elements under the heading "Application as Primary" and you find that the State did not prove each of these four elements under this heading beyond a reasonable doubt you must say by your verdict "not guilty."

You need not be unanimous about the theory underlying either your "guilty" or "not guilty" verdict. If you all agree the defendant is guilty either as a primary actor or as a party, then you must find the defendant "guilty." If you all agree the defendant is not guilty as both a primary actor or as a party, then you must find the defendant "not guilty."

Additionally, the jury was instructed that simply being at the scene was not sufficient.

**D. Analysis**

Because Hinojosa does not challenge the legal sufficiency with regard to each element of the aggravated kidnapping offense, we limit our discussion to the element of "abduct." The State contends the jury could have found sufficient evidence that: (1) Hinojosa left his residence with Linares and Zambrano and that Hinojosa's presence was evidence of his restraining Abundez with intent to secrete or hold him; or that (2) Hinojosa's actions intentionally caused or aided Zambrano or Linares to do so.

*1. Evidence that Hinojosa Restrained Abundez*

Hinojosa first contends there was no evidence that Abundez was secreted or restrained. He claims he was not present when Abundez was abducted; and that even Abundez testified Hinojosa was present only for a short period of time. More importantly, however, Hinojosa argues the evidence points to Zambrano, and only Zambrano, as the individual with the firearm and there is no evidence that Hinojosa saw a weapon or even knew either Zambrano or Linares possessed a weapon. The State, on the other hand, contends both the direct and circumstantial evidence suggest Hinojosa was involved from the beginning, that he knew Abundez was being held against his will in the SUV driven by Hinojosa, that Hinojosa was potentially present when Linares and Zambrano assaulted and threatened Christian to keep him away from Abundez, and that the weapon and cell phone were thrown from Hinojosa's vehicle.

Assuming the evidence was actually conflicting, resolution of such rests solely with the jury, not this court. *Brooks*, 323 S.W.3d at 899. Furthermore, intent is a matter of fact for the jury to determine. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998). "It is up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place." *Hines v. State*,

75 S.W.3d 444, 448 (Tex. Crim. App. 2002). "This can be established by looking at all of the circumstances surrounding the offense." *Id.*

The jury heard evidence that Hinojosa agreed to drive Linares and Zambrano that evening, that "they" were partying and that "they" left Hinojosa's residence to go to "the ranch." Although Hinojosa was driving the SUV when he was stopped by the officers, there is also testimony to suggest Hinojosa was also the driver of the white truck when Zambrano held Abundez at gunpoint and used a gun to thwart Christian's attempt to rescue him. *Santellan v. State*, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997) (holding loading victim into car and driving away with her satisfied restraint); *Ramirez v. State,* 692 S.W.2d 729, 732 (Tex. App.—Waco, 1985, no pet.) (concluding that deadly force to abduct a person can be communicated separate and apart from exhibiting a deadly weapon). Based on Hinojosa's statement alone, he left his residence with Linares and Zambrano and was driving. The three men went to the ranch and from the ranch the three men left in a green SUV.

The jury could reasonably conclude that Hinojosa was present when Linares hit Christian and when Zambrano threatened Christian with a firearm. Hinojosa was not merely at the scene, but told the officers that he left his house with Zambrano and Linares and was in control of the vehicle from that point. As such, Hinojosa made the choice to stop, to wait for Zambrano and Linares to exit and re-enter the vehicle, and to leave the scene. Based on the evidence, a reasonable jury could conclude Hinojosa understood and assisted with the actions taking place.

Outside of the incident with Christian, the jury could also reasonably deduce that Hinojosa was helping Linares and Zambrano in their attempts to restrain Abundez from leaving. *See Ex parte Martinez*, 330 S.W.3d 891, 894 n.4 (Tex. Crim. App. 2011) ("The accused's presence in the accomplice's company before, during, and after the commission of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense.") (citing *Dowthitt v.*

*State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)). By his own testimony, Hinojosa was driving around in the SUV with Abundez being restrained in the back. Thus, the jury could reasonably conclude that Hinojosa was trying to secrete or hide Abundez's location. *See Earhardt v. State*, 823 S.W.2d 607, 618 (Tex. Crim. App. 1991) (holding that the only requirement for restraint is that the interference with liberty be substantial): *Jenkins v. State*, 248 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (finding that bearing and firing a firearm in an apartment while refusing to allow victim to leave constituted restraint by threatening deadly force); *see also Hines*, 75 S.W.3d at 448 (holding forcing entry into bank, threatening employee with weapon, and ordering her to open vault supported finding of abduction and restraint).

2.  *Evidence that Hinojosa Intentionally Caused or Aided the Others to Restrain Abundez*

Hinojosa next argues the State established Hinojosa's presence at the scene of the arrest and nothing more. Hinojosa contends the record is silent as to any knowledge on his part that Abundez was kidnapped. To the contrary, Hinojosa argues the evidence shows he was not present when Abundez was abducted from his home and forced into the white truck. Hinojosa further asserts that Linares's drunken state supports his theory that Linares requested Hinojosa drive the SUV. Hinojosa maintains there is simply no evidence that he knew Abundez was riding in the SUV against his will.

The State may rely on circumstantial evidence to prove Hinojosa either intentionally caused or aided Zambrano and/or Linares in restraining Abundez. *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim. App. [Panel Op.] 1978); *see also Rivera v. State*, 12 S.W.3d 572, 575 (Tex. App.—San Antonio 2000, no pet.). And, as Hinojosa contends, mere presence alone is not sufficient. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). The State must also show an act done by Hinojosa that shows his intent to promote or assist such conduct. *Id.* A jury may look

at events occurring before, during, and after the offense and the defendant's behavior to show understanding and common design and the existence of such agreement may be inferred from the acts and words of the parties. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994). The jury must look at the cumulative effect of all the incriminating facts, as opposed to each individual fact. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Here, the jury could reasonably deduce that Hinojosa was present at several stages of the kidnapping and assisted Zambrano and/or Linares along the way. By Hinojosa's own assertion, Linares's drunken state required Hinojosa drive the vehicle beginning at the Hinojosa residence, not at the ranch. Based on Abundez's testimony, although he could not identify the driver of the truck he was in when his brother was threatened, he could identify Hinojosa as the driver of the SUV when the weapon was thrown from the window, and when the SUV was stopped by Deputy Pecina. No one identified the driver of the white truck and Hinojosa told the officers that he was driving Linares and Zambrano when they left his residence earlier in the evening, before Abundez was ever abducted. Moreover, there was no evidence that either Zambrano or Linares was directing Hinojosa where to travel. During his interview with Sergeant Elizalde, Hinojosa told the officer that he was giving the men a ride, but did not provide any more details or indicate to where they were traveling.

At a very minimum, Hinojosa was driving the SUV wherein Abundez was being held at gun point and from which the weapon and the cell phone were thrown. Based on the testimony of the Abundez brothers, and the circumstantial evidence surrounding the offense, the jury could reasonably infer there was an agreement between the parties to kidnap Abundez and Hinojosa's actions were an attempt to assist and aid Zambrano and Linares in doing so. *See Ex parte Martinez*, 330 S.W.3d at 894 n.4; *Tarpley*, 565 S.W.2d at 529.

**F.      Conclusion**

After viewing "all the evidence in the light most favorable to the verdict," based on the evidence presented at trial, including circumstantial evidence, a rational jury could have found Hinojosa guilty beyond a reasonable doubt.  *See Hardy*, 281 S.W.3d at 421; *Brooks*, 323 S.W.3d at 899.  Accordingly, this issue is overruled.[3]

### VARIANCE BETWEEN THE INDICTMENT AND THE COURT'S CHARGE

Hinojosa next contends that the evidence at trial was insufficient based upon a variance between the indictment and the court's charge.

**A.      Arguments of the Parties**

Hinojosa argues that a variance exists between the language in the indictment and the evidence offered at trial.  He contends that although the statute allows two definitions of abduct, i.e. secreting or use of deadly weapon, the State chose to narrow the element of the crime to a particular manner and means, specifically limiting "abduct" to "secreting or holding [Abundez] in a place where he is unlikely to be found."  *See* TEX. PENAL CODE ANN. § 20.01.[4]  Yet, the court's charge provided a definition of abduct as "using or threatening to use deadly force."  Hinojosa argues the charge was not only confusing to the jury, but impermissibly broadened the scope of the alleged offense.

---

[3] Although Hinojosa and the State both briefed the issue of whether the jury could find that Hinojosa intentionally failed to exercise reasonable efforts to stop the kidnapping, the jury was not charged under such theory and, therefore, could not have found Hinojosa guilty under such theory.  *Vasquez v. State*, 389 S.W.3d 361 (Tex. Crim. App. 2012).  Accordingly, we do not address this issue on appeal.  *See* TEX. R. APP. P. 33.1; 47.1.

[4] The Texas Penal Code provides that

> "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person.
> "Abduct" means to restrain a person with intent to prevent his liberation by:
> > (A) secreting or holding him in a place where he is not likely to be found; or
> > (B) using or threatening to use deadly force.

TEX. PENAL CODE ANN. § 20.01(2).

The State counters that Hinojosa has not alleged any error in the indictment. Hinojosa concedes the hypothetically correct jury charge would have included the application paragraphs already given in this court's charge. The only distinction is the definition given for "abduct." The State further argues that even if Hinojosa could prove a material variance, there is no evidence that he suffered substantial prejudice as a result. We agree with the State.

**B.      Variance**

A variance is a discrepancy between the allegations in the indictment and the evidence adduced at trial. *Williams v. State*, 270 S.W.3d 140, 144 (Tex. Crim. App. 2008); *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001) (reinforcing the protection of "the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). A variance occurs when the State has proven the defendant guilty of a crime but the proof at trial varies from the allegations in the charging instrument. *Gollihar*, 46 S.W.3d at 246. The variance becomes "fatal" when the variance between the indictment and the evidence at trial denies the defendant notice of the charges against him. *Id.* at 256; *Moore v. State*, 11 S.W.3d 495, 499 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Only material variances that prejudice the defendant's substantial rights render the evidence insufficient or become fatal. *Gollihar*, 46 S.W.3d at 257; *Human v. State*, 749 S.W.2d 832, 836 (Tex. Crim. App. 1988) (holding that the rule that a mere or slight variance between what was alleged and what was proven is sufficient to render the evidence insufficient no longer applies). Allegations in the charging instrument giving rise to immaterial variances may be disregarded. *Id.*; *Gollihar*, 46 S.W.3d at 257.

Hinojosa contends that because the indictment only alleged the first of the statutory definitions of abduct, the State is bound by its allegation. As such, if the State proved Hinojosa guilty of abducting Abundez by "using or threatening to use deadly force," then the proof at trial

varies from the allegations in the charging instrument. *See Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) ("[T]he failure to prove the statutory language pled renders the evidence legally insufficient to support the conviction."); *Gollihar*, 46 S.W.3d at 254 ("[W]hen the controlling statute lists several alternative acts intended by the defendant and the indictment limits the State's options by alleging certain of those intended acts, the hypothetically correct charge should instruct the jury that it must find one of the intended acts alleged in the indictment."). Even if there is a variance, the *Gollihar* court explained that "a hypothetically correct charge need not incorporate allegations that give rise to immaterial variances." *Id.*

This court must, therefore, determine if the alleged variance was material.

### 1.      *Was the Alleged Variance Material*

A variance is material if it operated to the defendant's surprise or prejudiced the defendant's rights. *Fuller v. State*, 73 S.W.3d 250, 253 (Tex. Crim. App. 2002). Courts apply a two-pronged inquiry into whether a defendant's substantial rights were prejudiced: (1) whether the indictment, as written, informed the defendant of the charge against him or her sufficiently to allow him or her to prepare an adequate defense at trial, ***and*** (2) whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime. *Gollihar*, 46 S.W.3d at 257; *Reyes v. State*, 314 S.W.3d 74, 80 (Tex. App.—San Antonio 2010, no pet.). The appellant carries the burden of showing actual surprise or prejudice. *Santana v. State*, 59 S.W.3d 187, 194 (Tex. Crim. App. 2001).

Under *Santana*'s first prong, Hinojosa must demonstrate how the variance resulted in actual surprise. *Santana*, 59 S.W.3d at 195; *Gollihar*, 46 S.W.3d at 256. Hinojosa argues his defensive theory was that Abundez was never secreted or hidden "in a place he was unlikely to be found." As proof of such, Hinojosa relies on the questions posed to Abundez and argues that had

he known of the State's intent to use an alternative theory of "abduct," his defensive theory would have changed.

The State contends that the application paragraph also included the word "restrain" which is defined as "restricting his movement with the intent to prevent his liberation by secreting him or holding him in a place not likely to be found." Moreover, there was no objection to this definition. Therefore, the only theory under which the jury could convict was the one contained within the indictment. We agree.

The application paragraph of the court's charge combined the definitions of restrain and abduct such that the jury was presented with the same allegations as contained within the State's indictment. *Gollihar*, 46 S.W.3d at 254. Because the manner and means proven at trial were contained within the indictment and the court's charge, albeit in a different form, Hinojosa failed to prove actual surprise. *Santana*, 59 S.W.3d at 194. Moreover, the trial court modified the proposed charge based on the requested definitions provided by Linares's attorney and neither Hinojosa nor his attorney objected to the court's charge. TEX. R. APP. P. 33.1(a) (requiring complaint to the trial court).

Because Hinojosa failed to prove actual surprise, we need not address Hinojosa's risk of being prosecuted later for the same crime. *Santana*, 59 S.W.3d at 194. Accordingly, Hinojosa failed to show the alleged variance was material.

### 2.	*Was the Evidence Sufficient Under the Hypothetically Correct Jury Charge?*

Even assuming the alleged variance was material, Hinojosa must also prove the evidence was insufficient against a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *accord Fuller v. State*, 73 S.W.3d 250, 252 (Tex. Crim. App. 2000). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's

theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240; *accord Clinton v. State*, 354 S.W.3d 795, 799 (Tex. Crim. App. 2011) ("To identify 'the essential elements of the crime,' we look to 'the hypothetically correct jury charge for the case.'"). More specifically, a hypothetically correct jury charge encompasses statutory elements of the offense as modified by the State's indictment. *Gollihar*, 46 S.W.3d at 257.

Although the statute allows for two different manner and means of "abduction," the State is limited by what is charged in the indictment.

### a. Arguments of the Parties

Hinojosa argues that the indictment limited the abduction to "secreting or holding him in a place where he is not likely to be found," but the trial court's charge allowed the jury to convict on abduction by "using or threatening to use deadly force." Hinojosa continues that because the application part of the charge follows the indictment language, but the definition portion of the charge does not, the jury could not have clearly understood the charges against Hinojosa and the jury was, therefore, allowed to convict Hinojosa based upon evidence never presented in the indictment. More specifically, Hinojosa alleges the evidence should have been measured by the elements of the offense present in the jury charge, and nothing more. Based on Abundez's testimony that he was not in a place where he was unlikely to be found, Hinojosa contends a rational jury would have held differently. As such, a reasonable juror could only have convicted Hinojosa if they were also considering abduction by use of or threating to use a deadly force.

The State counters that any reliance on the theory of confinement within the Expedition necessarily included moving Abundez to a place where he was not likely to be found. We agree.

b.      Analysis

This case is analogous to *Curry v. State*, 30 S.W.3d 394 (Tex. Crim. App. 2000). The indictment charged Curry with aggravated kidnapping "by using and threatening to use deadly force namely, a firearm," but the trial court allowed the State to amend the indictment delete this allegation after the start of the trial. *Id.* at 396. The Court of Criminal Appeals concluded that because "the indictment specifically alleged that Curry acted 'by using and threatening to use deadly force namely, a firearm.' . . . an 'adequate description of the offense' for which Curry was tried would include this manner and means of abduction." *Id.* at 405. The court then turned to a sufficiency of the evidence review based on a hypothetically correct jury charge. *Id.*; *Malik*, 953 S.W.2d at 240.

Similarly, here the indictment alleged that Hinojosa intended to prevent Abundez's liberation, "by secreting or holding him in a place where he was not likely to be found, and the defendant did then and there use or exhibit a deadly weapon, to wit: a pistol." The indictment's manner and means alleged an "adequate description of the offense." *See Curry*, 30 S.W.3d at 405. The charge also included the "essential elements of the crime." *See Fuller*, 73 S.W.3d at 252; *Malik*, 953 S.W.2d at 240. As per Linares's counsel's request, and without objection from Hinojosa's counsel, the charge provided as follows:

> "Abduct" means to restrain a person with intent to prevent his liberation by using or threatening to use deadly force.

> "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another where he is not likely to be found or by confining the person.

The proof at trial supported that Hinojosa, Zambrano, and Linares confined Abundez in a moving SUV, Hinojosa's Expedition, and that the SUV was being driven by Hinojosa. A reasonable jury could conclude that a moving SUV was a place where a person was unlikely to be

found. If the jury believed Abundez was confined, then Hinojosa and his co-defendants also (1) substantially interfered with Abundez's liberty, (2) moved him from one place to the other, (3) prevented Abundez's liberation, and (4) secreted or held him in a place where he was not likely to be found.

### C.      Conclusion

We conclude that the charge did not contain a material variance from the indictment. Yet, even assuming a material variance, the unobjected to jury charge accurately set out the law, was authorized by the indictment, and did not "unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240; *see also* TEX. R. APP. P. 33.1. We, therefore, overrule this issue on appeal.

### IMPROPER JURY ARGUMENT

Hinojosa next asserts the prosecutor's comments during closing argument were improper and outside the scope of permissible jury argument and violated his right to a fair trial.

### A.      Proper Jury Argument

"The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial in order to arrive at a just and reasonable conclusion based solely on the evidence." *Harris v. State*, 122 S.W.3d 871, 883 (Tex. App.—Fort Worth 2003, pet. ref'd). "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *see also Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (same); *Coble v. State*, 871 S.W.2d 192, 204 (Tex. Crim. App. 1993) (same). A prosecuting attorney is permitted

in his argument to draw from the facts in evidence all inferences which are reasonable, fair, and legitimate, but he may not use the jury argument to get before the jury, either directly or indirectly, evidence which is outside the record. *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990) (citing *Jordan v. State*, 646 S.W.2d 946, 948 (Tex. Crim. App. 1983)). Comments which appear to cast aspersions on the character of defense counsel, and as a result, "strike over counsel's shoulders at the defendant," are not within the zone of proper jury argument. *Nevels v. State*, 954 S.W.2d 154, 158 (Tex. App.—Waco 1997, pet. ref'd).

When jury argument falls outside the approved areas, "it will not constitute reversible error unless [it] is extreme or manifestly improper . . . or injects new facts harmful to the accused into the trial proceeding." *Temple v. State*, 342 S.W.3d 572, 602–03 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *see* TEX. R. APP. P. 44.2(b); *Brown*, 270 S.W.3d at 570;.

## B.    Hinojosa's Preservation of Error

In order to preserve any error based on improper jury argument, the defendant must object to the argument and pursue the objection until the trial court rules adversely. TEX. R. APP. P. 33.1(a); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004). The objection must be "a timely, specific request that the trial court refuses." *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004).

The State contends that Hinojosa failed to preserve any alleged error with regard to the State's closing argument in two different ways: (1) co-counsel, and not Hinojosa's counsel, made the objections before the trial court; and (2) although the trial court provided an instruction to disregard, Hinojosa failed to pursue the objection to an adverse ruling. TEX. R. APP. P. 33.1(a). We address each separately.

*1.    Reliance on Co-Defendant's Counsel*

As the State points out, Hinojosa's counsel did not personally object.  Hinojosa's counsel apparently relied on the objections lodged by his co-defendant's counsel.  However, to preserve error, a defendant is generally unable to rely on an objection made by a co-defendant's counsel, without voicing his own personal objection.  *Martinez v. State*, 833 S.W.2d 188, 191 (Tex. App.—Dallas 1992, pet. ref'd) (citing *Lerma v. State*, 679 S.W.2d 488, 498 (Tex. Crim. App. 1982)).  To do so, defense counsel, or the defendant himself, may adopt a co-defendant's objection and preserve error "when there is sufficient indication in the record of his intent to adopt the objection." *Martinez*, 833 S.W.2d at 191; *Woerner v. State*, 576 S.W.2d 85, 86 (Tex. Crim. App. 1979); *Enlow v. State*, 46 S.W.3d 340, 346 (Tex. App.—Texarkana 2001, pet. ref'd) ("A co-defendant may adopt the objection of his fellow defendant, but that adoption must be reflected in the record.").

Here, Hinojosa and his counsel were silent during the objections lodged by his co-defendant's counsel.  Although the record reflects that Hinojosa's counsel deferred to Linares's counsel for purposes of closing argument, there is nothing in this record to reflect Hinojosa's counsel joined in the objections.  Therefore, we must conclude Hinojosa failed to preserve any objection to the State's jury argument.  *Uyamadu v. State*, 359 S.W.3d 753, 767–68 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

*2.    Compliance with Texas Rule of Appellate Procedure 33.1(a)*

In addition to objecting, before complaining about improper jury argument on appeal, an accused must pursue an adverse ruling to his objection or he forfeits his right to complain about the argument on appeal.  TEX. R. APP. P. 33.1(a); *Mathis v. State*, 67 S.W.3d 918, 926–27 (Tex. Crim. App. 2002) (reiterating test set out in *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)).

Here, Linares's defense counsel lodged several objections. But counsel only requested an instruction to disregard as to one argument, the prosecutor's "tactics" remark. And even then, when the objection was sustained, an instruction was given but neither Linares's defense counsel nor Hinojosa's defense counsel sought a mistrial. Accordingly, we conclude that Hinojosa failed to properly preserve error.

Assuming, arguendo, the argument was preserved, we turn to the merits of Hinojosa's complaint regarding the State's jury argument.

## C.      Objections to the State's Jury Argument

Because Hinojosa raises several different objections within the State's closing, we address each individually.

### 1.      *Video*

Hinojosa first argues the prosecutor attempted to shift the burden of proof to the defense and made disparaging remarks about defense counsel. The State counters that the prosecutor's statement that defense counsel did not know how to offer evidence was not directed at the ethical integrity or essential functions of defense counsel and it was not calculated to draw distinctions between the prosecution and the defense counsel. Additionally, the State contends the prosecutor's remark was an invited response to defense argument:

> *Defense Closing*
> Defense:   What did they bring? They brought Nestor's uncorroborated story, his brother, a gun of unknown origin or handling, telephones of unknown origin or handling, and bullets from [a] gun not in evidence. I could have showed you a video, but they refused.
> State:   Objection
> Court:   [That is] in violation of the motion in limine. I'm going to take time off your closing arguments. . . . I don't want to get into areas that are improper.
>
> *State Rebuttal*
> State:   Now, ladies and gentlemen, the Defense wants you to believe that I tried to keep out this video. They brought this out twice during their closing.

> Ladies and gentlemen, there are rules of evidence, certain things come in and don't, and if defense attorney doesn't know how to bring in the evidence, that's not the State's fault.

A prosecutor may properly comment on a defendant's failure to introduce evidence, as long as the remarks do not fault the defendant for failing to testify. *See Jackson v. State*, 17 S.W.3d 664, 674 (Tex. Crim. App. 2000); *Patrick v. State*, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995). An appellate court looks at the challenged language from the jury's standpoint and determines whether the comment "was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001). Reversal is not required where the language can be reasonably construed as referring to a defendant's failure to produce testimony or evidence from sources other than himself. *Livingston v. State*, 739 S.W.2d 311, 338 (Tex. Crim. App. 1987).

Here, the remarks were clearly directed at defense counsel's closing argument, to which the prosecutor objected when the comment was made. *See Caron v. State*, 162 S.W.3d 614, 618 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (concluding that State's remarks about appellant's right to call alibi witnesses constituted permissible argument and did not shift the burden of proof to appellant); *Sanders v. State*, 74 S.W.3d 171, 173 (Tex. App.—Texarkana 2002, pet. ref'd) (holding prosecutor's remark that "the defense could have subpoenaed [alibi witness] to testify if in fact he had been the one driving, and the defense had failed to do so" was permissible jury argument). Furthermore, based on the trial court's pronouncement that the comment violated the motion in limine, defense counsel was aware that any argument regarding the video was off limits.

### 2. *Bolstering Witnesses*

Hinojosa next contends the State's arguments bolstered the testimony of Deputy Pecina, Abundez, and Christian Abundez.

Argument that injects the prosecutor's opinion of a witness' credibility is improper. *Williamson v. State*, 771 S.W.2d 601, 608 (Tex. App.—Dallas 1989, pet. ref'd). Proper jury arguments may, however, include argument as to the truthfulness of a witness's testimony so long as the argument is based on the evidence presented and reasonable deductions from such evidence, including the complainant's demeanor while testifying. *See Gonzalez*, 337 S.W.3d at 483; *see also Good*, 723 S.W.2d at 736–37 (holding that prosecutor's argument on truthfulness of witness was reasonable deduction from witness's testimonial demeanor, which is considered to be in evidence); *Graves*, 176 S.W.3d at 431 (stating that jury argument may include vouching for witnesses' credibility if it is reasonable deduction from evidence).

> *State's Opening Argument*
> Deputy Pecina is not a rookie. He's not a one-year deputy. He's been on the force for 11 years I believe. And he can sense something is wrong.

> *State's Jury Argument*
> If Deputy Pecina had not pulled him over that night and Mr. Hinojosa had not been speeding that night, they would have not been found. Who knows what would happen? Deputy Pecina, terrible witness, poor man, terrified, nervous. But, you know what, his instincts were right. The behavior of Mr. Hinojosa was the first red flag.

The State's closing argument regarding the truthfulness of Deputy Pecina's testimony was "based on reasonable deductions from the evidence" and did not constitute unsworn testimony. *See Gonzalez*, 337 S.W.3d at 483; *see also Wesbrook*, 29 S.W.3d at 115; *Felder*, 848 S.W.2d at 95. The prosecutor neither inquired whether Deputy Pecina had a motive to testify untruthfully nor represented that Deputy Pecina had no such motive. *See Williamson*, 771 S.W.2d at 608. Also, the prosecutor indicated that Deputy Pecina was a terrible witness and that he was terrified and nervous. She pointed out that his instincts were right, but she did not make any comments regarding the officer's truthfulness. *Cf. Simons v. State*, 648 S.W.2d 21, 22 (Tex. App.—Dallas

1983, no pet.) (rejecting prosecutor's statement that two police officers who testified "were telling you the truth about the way [the defendant] was driving.").

With regard to Nester and Christian Abundez, Hinojosa argues that the prosecutor's statements were improper and turned her into an unsworn witness. The testimony at issue is:

> You saw both Mr. Abundezes take the stand. Ask yourselves these questions: Do they have a reason to lie? Do they have a reason to come to this Court and lie? Do they have a reason to lie to you, to lie to the Court? Think about it. They're resident aliens. Perjury is a felony. Do they have a reason to lie a year and a half later? No. They don't.

Contrary to Hinojosa's assertions that the prosecutor improperly expressed her personal opinion regarding the credibility of her witnesses, we conclude these statements are more akin to a lack of evidence in the record as to any reason for the two witnesses to lie under oath, not a statement by the prosecutor as to her personal opinion concerning their veracity. *Cf. Menefee v. State*, 614 S.W.2d 167, 168 (Tex. Crim. App.1981) (op. on reh'g) ("I don't believe I have ever seen anybody that I thought was any more honest than she is."); *see also Simons*, 648 S.W.2d at 22 (holding prosecutor injected personal opinion of witness' credibility by stating witness was "telling you the truth" and "had no motive to lie").

### 3. *References to CSI*

Hinojosa next contends error in the prosecutor's reference to the television show, CSI. Specifically, Hinojosa argues it was error to allow the prosecutor to comment that (1) the CSI show put together cases in less than an hour, with five commercial breaks, and (2) the jury was "not going to see any of that fancy stuff here today." We conclude the prosecutor's comments were a statement regarding what evidence the jury would or would not hear.

*4.      Tactics/Smoke and Mirrors*

Hinojosa next points to the prosecutor's use of terms like "tactics," "smoke and mirrors,"

and "hide the ball" to personally attack defense counsel and his role in ethically representing his

client.  Hinojosa points us to the following language:

State:     Ladies and Gentlemen, let's look at the tactics employed here.  Tactic
           number one, put the victim on trial.  The victim is on trial here.  What
           does he try to do?  Call him a drug dealer.  Call him a drug user.  The
           victim is not on trial.  This is called smoke and mirrors, hide the ball,
           distract, look over there because G-d forbid you notice the truth.

       . . . .

           Now, tactic number two, attack the district attorney by claiming that I
           somehow threated the victim to testify.  You've heard him.  I never
           offered him.  I never promised anything, and I didn't threaten him.
Defense:  Objection, Your Honor.
Court:    Overruled.  The jurors know what the evidence is.  Let's move on.

Terms such as "rabbit trails" and "smoke screens" have been considered proper in reference

to defense evidentiary tactics.  *Mosley*, 983 S.W.2d at 260 (determining no harm in "[defense

counsel] want[s] you to take a side road, a series of side roads, rabbit trails, and a rabbit trail that

will lead you to a dead-end"); *see also Pope v. State*, 161 S.W.3d 114, 126–27 (Tex. App.—Fort

Worth 2004), *aff'd*, 207 S.W.3d 352 (Tex. Crim. App. 2006) (holding "smoke and mirrors," "red

herrings or rabbit trails" were response to arguments of defense counsel); *Cole*, 194 S.W.3d 547

(concluding "another trick" was not an improper response to defense argument); *Banks v. State*,

643 S.W.2d 129, 134 (Tex. Crim. App. 1982) (holding "all these rabbit trails, all these smoke

screens that he wants you to hide behind and chase down" proper as comment on defendant's

failure to produce testimony other than his own words).

Similar to the present case, in *Beasley v. State*, 864 S.W.2d 808, 811 (Tex. App.—Fort

Worth 1993), *aff'd*, 902 S.W.2d 452 (Tex. Crim. App. 1995), the prosecutor argued "but you can

see through the clouds of the smoke screen by a very clever Defense attorney."  The *Beasley*

remarks were also made in response to defense counsel's attack of the victim. In declining to find improper jury argument, the court held the prosecutor's argument properly responded to defense counsel's argument "that sought to place emphasis on the character of the victims rather than the acts of the defendant." *Id.* at 812.

Although Hinojosa directs this court to *Lopez v. State*, 705 S.W.2d 296 (Tex. App.—San Antonio 1986, no pet.), for authority, the case is inapplicable to the present case. In *Lopez*, the prosecutor continuously exceeded the bounds of acceptable jury argument by referencing withheld evidence, giving his personal assurance of the defendant's guilt, and "invit[ing] the jury to speculate as to evidence not in the record." *Id.* at 298. This record simply does not support similar behavior by the prosecutor. Here, defense counsel accused Abundez of making up the alleged incident and instead suggested the alleged attack was associated with Abundez's gang affiliation, the events were the result of an ongoing fight, and that Abundez had been smoking pot on the night in question.

We conclude the State's arguments were in response to defense counsel's closing arguments.

### 5. *Defense Counsels' Conversation with Abundez*

Hinojosa next contends (1) "the State struck at [Hinojosa] over the shoulders of his counsel" but suggesting counsel acted in bad faith by attempting to persuade Abundez not to testify, (2) "the prosecutor injected a new and harmful fact in closing argument" never testified to by Abundez, and (3) even assuming defense counsel's question during cross-examination was improper, the trial court's instruction was sufficient; and, therefore, the State's argument was not invited. At issue is the following language:

*Abundez Cross-Examination*

Defense:   And so when you and I met and spoke 2 or 3 days ago, when you told me that you were afraid that they would charge you with the offense, you were lying to me?

The State objected and the following was argued *out of the presence of the jury*.

State:   This statement that we're going to charge him with an offense, this is ridiculous Your Honor.

Defense:   That's what he told me.

State:   It is utterly ridiculous, Your Honor.  It's the most disgusting behavior I've ever seen in a Defense counsel ever.

   . . . .

   And, Your Honor, I want everything stricken about the statement, threatening to arrest or charge this victim, the victim, mind you, with anything.

   . . . .

Court:   Again, I'll remind the jury to disregard any statements made in conjunction with the previous one that I asked you to disregard the District Attorney's Office and the allegations of his conduct.  Let's proceed.

Upon further cross-examination, Abundez denied that he was afraid of being charged with any offense by the State.  "The only thing I said was that I did not want to come."

*State's Jury Argument*

State:   Then you heard the victim, all three of them went to his house on Friday before trial to try and convince him not to testify.

Defense:   Objection, Your Honor.  That leaves a false impression with the Jurors with the lawyers, not the clients.

State:   I'm sorry.  The three attorneys.  The three attorneys went to this person's house to try to get him not to testify the Friday before trial.

Defense:   Objection, Your Honor.

Court:   Sustained.

Defense:   It mischaracterizes the evidence.  Nobody tried to get him not to testify.

Court:   All right.  Move on.

   . . . .

State:   What [defense attorneys] say is not evidence as much as they'd like for it to be.

Defense:   Objection, Your Honor.  It switches the burden.

Court:   Sustained.  Move on.

Comments which appear to cast aspersions on the character of defense counsel, and as a result, "strike over counsel's shoulders at the defendant," are not within the zone of proper jury

argument. *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995); *Nevels v. State*, 954 S.W.2d 154, 158 (Tex. App.—Waco 1997, pet. ref'd). Although articulating precise rules is difficult, the court has cautioned that "a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Even when couched in terms of a rebuttal, proper defense counsel's arguments "cannot serve as a basis for permitting prosecutorial comments that 'cast aspersion on defense counsel's veracity with the jury.'" *Cole v. State*, 194 S.W.3d 538, 544 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (quoting *Mosley*, 983 S.W.2d at 259); *accord Dinkins*, 894 S.W.2d at 357.

Hinojosa relies on *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1996), *abrogated on other grounds*, *Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002), for support. The argument in *Wilson* focused on the following portion of the State's argument.

> I have taken a very sacred oath, in my opinion, to see that justice is done in every case I prosecute. It is your duty—and in the last paragraph of this charge you can see—to see that justice is done in this case.
>
> [Defense Counsel] has no such oath, and what he wishes is that you turn a guilty man free. That's what he wishes, and he can wish that because he doesn't have the obligation to see that justice is done in this case.

*Id.* at 58. The court concluded that because the case did not include any evidence of the prosecutor's oath, the State's argument injected new facts into the case and therefore the argument was harmful to the defendant. *Id.* at 60.

Here, the prosecutor's argument is not akin to *Wilson*. During cross-examination of the State's key witness, defense counsel suggested (1) that Abundez had been coerced and threatened by the State regarding his testimony and (2) that Abundez was lying about the events that evening. The State objected at the time and received an instruction from the trial court.

Unlike the State's argument in *Wilson*, here, defense counsel raised the issue before the jury and placed the issue of their speaking to Abundez "2 or 3 days" before the start of the trial. *Wilson*, 938 S.W.2d at 60. When the State attempted to respond to the defense questions during her closing argument, the trial court ultimately sustained the defense objection and instructed the State to "move on." We, therefore, conclude the State's argument properly responded to defense counsel's argument that the State was threatening Abundez to testify and that Abundez was lying regarding the alleged events. *See Alami v. State*, 333 S.W.3d 881, 892–93 (Tex. App.—Fort Worth 2011, no pet.); *Caron*, 162 S.W.3d at 618.

### 6. *Prosecutor as Unsworn Witness and Statements Impeaching Hinojosa*

Hinojosa next contends that the prosecutor's comments regarding his tossing the cell phone out the window was testimony outside the record.

> State: [Hinojosa's] doing this, and he's looking around. And now it's a question, do I get caught with it on me, or do I toss it and hope that the camera doesn't catch it. And if you watch the video, ladies and gentlemen, you will see him throwing it.
>
> You know what he's is throwing? The victim's cell phone. Watch the video. You will see it.

Hinojosa also contends that the prosecutor's statements regarding the inconsistent statements were an attempt to impeach Hinojosa, even though Hinojosa did not testify.

> State: We know that the stories were inconsistent. We know that Mr. Hinojosa claims that he was at home asleep and Mr. Linares, give me a ride because the tint is dark? . . . Mr. Linares's story, after he tells that he wants to make a deal, confidential informant for DEA and LPD with Primo Guzman, oh, no. All of us were together partying. The three Defendants were partying according to Mr. Linares's story, which is what was elicited in the testimony.
>   . . . .
> No matter how much the picture is painted, the fact remains, there's only one true story. You know how you know it's true, because the three Defendants gave three different stories to [ ] Sergeant Elizalde.

Defense:   Objection, Your Honor, mischaracterization of the evidence.

            . . . .

State:      They were completely inconsistent.

Viewing the arguments in context, we conclude the argument was a reasonable, fair, and legitimate inference drawn from all of the facts in evidence. *See Borjan*, 787 S.W.2d at 57. With regard to the inconsistencies of the statements, Sergeant Elizalde specifically testified that all three defendants' statements were inconsistent. Accordingly, the argument was proper. *Brown*, 270 S.W.3d at 570; *Wesbrook*, 29 S.W.3d at 115.

### 7.      *Asking Jurors to Put Themselves in Victim's Position*

Finally, Hinojosa argues the prosecutor's request that the jury put themselves in the victim's position is not merely summarizing the evidence but instead appealing to the personal passions of the jury. *See Torres v. State*, 92 S.W.3d 911, 922 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The following comments are at issue:

State:      Am I to tell the victim, sorry, we don't care about your case because it wasn't done up to the standards that I would like? Am I to tell the victims that, ladies and gentlemen? How would you feel if you would [live] in a rural community and those were the deputies investigating that case?

            . . . .

            Ladies and gentlemen, if somebody puts a gun to your head, are you free to leave? Are you free to leave when somebody has a gun pointed at you[?] You can restrict and restrain somebody's movements without ever touching them.

We recognize that it is improper for a prosecutor to ask members of the jury to place themselves in the shoes of the victim. *United States v. Cook*, 592 F.2d 877 (5th Cir. 1979); *Chandler v. State*, 689 S.W.2d 332 (Tex. App.—Fort Worth 1985, no pet.). However, the prosecutor's argument in the present case was short and Hinojosa's counsel did not raise an objection. There were no repeated urgings for the jury to put themselves in the shoes of the victim. Taken in context, the argument was more an explanation of the officers' actions and inactions.

The offense in question occurred in a rural part of the county and the prosecutor was simply attempting to place the offense in context. *See Brown v. State*, 270 S.W.3d at 570. Accordingly, we conclude the argument did not exceed the permissible boundaries for a jury argument.

>    *8.    Harm Analysis*

Although we conclude the prosecutor's arguments were proper, even assuming an improper argument, the appellant still bears the burden to prove the error affected his substantial rights. TEX. R. APP. P. 44.2(b); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011). We, therefore, conduct a harm analysis.

When jury argument falls outside the approved areas, "it will not constitute reversible error unless [it] is extreme or manifestly improper . . . or injects new facts harmful to the accused into the trial proceeding." *Temple*, 342 S.W.3d at 602–03; *see* TEX. R. APP. P. 44.2(b). In determining whether the prosecutor's overall comments amounted to improper jury argument, the reviewing court considers (1) "[the] severity of the misconduct (prejudicial effect [of the prosecutor's remarks]), (2) curative measures, [and] (3) the certainty of conviction absent the misconduct." *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000); *accord Mosley*, 983 S.W.2d at 259.

As stated above, we find the record does not support that Hinojosa properly preserved any error. Even assuming preservation, we cannot say the comments violated the areas of proper jury argument; and more importantly, we cannot conclude any such arguments substantially affected Hinojosa's rights.

### CONCLUSION

After viewing "all the evidence in the light most favorable to the verdict," based on the evidence presented at trial, including circumstantial evidence, a rational jury could have found the evidence, beyond a reasonable doubt, that Hinojosa either intentionally or knowingly abducted

Abundez and used or exhibited a deadly weapon during the kidnapping or Hinojosa intentionally caused or aided Zambrano and Linares to abduct Abundez wherein a deadly weapon was used or exhibited. *See Hardy*, 281 S.W.2d at 421; *Brooks*, 323 S.W.3d at 899.

Additionally, we conclude the charge did not contain a material variance from the indictment. Yet, even assuming a material variance, the charge accurately set out the law, was authorized by the indictment, and did not "unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." TEX. R. APP. P. 33.1; *Malik*, 953 S.W.2d at 240.

Finally, we conclude the prosecutor's arguments were proper. *Brown*, 270 S.W.3d at 570. Yet, even assuming an improper argument, the appellant failed to prove the error affected his substantial rights. TEX. R. APP. P. 44.2; *Freeman*, 340 S.W.3d at 728.

Accordingly, we overrule Hinojosa's issues on appeal and affirm the trial court's judgment.

Patricia O. Alvarez, Justice

PUBLISH