

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00412-CR

JEFFERY SEAN NOBLETT, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 320th District Court
Potter County, Texas
Trial Court No. 67,623-D, Honorable Don R. Emerson, Presiding

September 30, 2015

## MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Jeffrey Sean Noblett, appeals his conviction for aggravated kidnapping and the resulting fifty-year sentence and $10,000 fine.[1] On appeal, he challenges the sufficiency of the evidence, the trial court's charge to the jury, and several of the trial court's evidentiary rulings. We will affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 20.04(a)(5) (West 2011).

## Factual and Procedural History

On August 12, 2013, Amarillo Police Department Corporal Toby Hudson had just returned from vacation and was on his way to the department to pick up his work car and return to his official duties. En route, however, he witnessed something unusual at the intersection of Southwest Third Street and South Bryan Street: two men standing in the middle of the road facing each other with what appeared, at Hudson's first glance, to be a pile of clothing and boxes. Noting that the scene struck him as "odd" and "out of place," Hudson turned around and drove to the immediate area where he had seen the two men and the unidentified bundle. Once there, Hudson discovered that what he initially thought might have been a bundle of clothing was actually the body of a man, who was later identified as Lance Hooser. Hudson summoned both fellow police officers and emergency medical personnel and, while waiting for them to arrive, attempted to resuscitate Hooser, to no avail. Hooser, bearing signs of having been bound, strangled, beaten, and shot, had died.

Police discovered the synopsis of the story which led to Hooser being found dead in the road: a group of acquaintances in the methamphetamine trade became embroiled in internal hostilities and, ultimately, one man—Hooser—was killed. The ensuing investigation revealed the details of events and circumstances leading up to Hooser's death. As it relates to this particular incident, the group included Hooser, Terry Young, Robert Melton, Ricky Burns, Bobby Crawford, Brittney Bralley, and appellant. Sometime around late July or early August 2013, Hooser had borrowed appellant's pickup truck, apparently, to complete a methamphetamine deal in which he was supposed to sell some methamphetamine and keep some for appellant, Bralley, and

2

Young. But Hooser refused to return the truck and, it seems, failed to complete the drug transaction as agreed. Only after a chase and some amount of police intervention did appellant regain possession of the truck. Clearly, hostilities had begun to brew within the group as a result of the soured transaction. In a recorded phone conversation with Young, appellant is heard to complain of Hooser and to express a desire to find out his whereabouts.[2]

Bralley, appellant's girlfriend at the time, testified that she and appellant went to a house on South Tennessee Street shortly after having received a phone call from Melton, but she did not know why they were going there. While she stayed in the truck, appellant went up to the back door of the house and remained standing there. She saw some of the other men in the group—Melton and Young—very briefly and observed that they had their faces covered. Bralley testified that she paid little attention as to what appellant was doing and plucked her eyebrows as she waited in the truck. She did hear one scream as she sat in the truck. After about ten minutes or so, appellant and Bralley left in appellant's truck and went to get gas. Though she testified that appellant told her nothing about the visit to the house, she was reminded as she sat on the witness stand that, in her initial statement to police, she had reported that appellant told her that he heard Hooser scream from inside the house.

After appellant put gas in his truck, he and Bralley went to Young's house, where, she testified, the two men spoke briefly in the alley as she once again waited in the

---

[2] Appellant gave consent for the police to search his phone even though he admitted to having taken efforts to delete everything from it after the incident. Police were able to retrieve many recorded conversations, however, including ones in which appellant expressed his remaining hostility toward Hooser and his intent to seek revenge.

truck.  She did not hear any of the conversation but described Young's facial expression as "shocked, like he had seen a ghost."

Clay Rolan, the lead investigator, learned from appellant's statement to him that Hooser was initially kidnapped at the house on Tennessee Street and that five men were there along with Hooser: Young, Crawford, Melton, Burns, and appellant. According to appellant's statement, he arrived at the house knowing that the plan was to "rough up" Hooser, to scare him a little bit in retribution for having reneged on one or more of the drug deals arranged by the group.  Appellant explained that he was tasked with standing by the car that had been backed up to the back porch with its hatchback open and making certain that no one was watching the goings-on at the house.  While appellant performed those tasks standing by the back door, he heard Hooser yelling and heard that Hooser was being beaten.  When someone in the group said that a stronger binding material was needed because the tape was proving inadequate, appellant retrieved red wire that was used to wrap around Hooser's neck; he unsuccessfully attempted to cut the wire into pieces designed to wrap around Hooser's wrists and ankles.  Appellant also heard a declaration by one of Hooser's assailants that they were going to "cut his balls off."

Appellant admitted to having helped by holding or lifting Hooser's shoulders as the other men were carrying the beaten Hooser to load him into the back of the car. The men continued to attack Hooser as he was in the back of the car.  Young informed appellant that the men were going to take Hooser out to the country and scare him some more.  Appellant responded, "Okay, I'm going to go."  Initially, Rolan understood appellant to mean that he was declaring his intent to discontinue his involvement in the

4

matter but discovered that appellant was actually expressing his desire to join the group out in the country as it continued its assault on Hooser. Rolan learned that Young called appellant after the group left the house with Hooser and alerted appellant that the plans had changed and that everyone was meeting at Young's house. Appellant, along with Bralley, then went over to Young's house where the two talked in the alley. Appellant advised Young to burn the vehicle that had been used to transport Hooser.

From the record before us, we do not know the precise sequence of events after Hooser was taken from the house on Tennessee Street. We do know, however, that, at some point after Hooser was loaded into the car and sometime after appellant left to go get gas, presumably to follow the group out to the country, Hooser was fatally shot in the neck and the abdomen. The evidence suggests that it was Burns who actually shot Hooser and that Melton also played a significant role in the physical assault on Hooser. It seems apparent from the record that appellant was not present when Hooser was killed.

Based on this evidence, the Potter County jury found appellant guilty of aggravated kidnapping and assessed punishment at fifty years' imprisonment and a $10,000 fine. From this conviction, appellant has appealed.

### Sufficiency of the Evidence

It is in his sixth point of error that appellant contends the evidence is insufficient to support his conviction for aggravated kidnapping; however, because this point of error would, if sustained, afford the greatest relief to appellant, we will address the sufficiency of the evidence first. *See Chaney v. State*, 314 S.W.3d 561, 565 (Tex.

5

App.—Amarillo 2010, pet. ref'd) (citing TEX. R. APP. P. 43.3 and *Bradleys' Elec. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam)).

Standard of Review

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). "[O]nly that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction." *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*." *Id.* When reviewing all of the evidence under the *Jackson* standard of review, the ultimate question is whether the jury's finding of guilt was a rational finding. *See id.* at 906–07 n.26 (discussing Judge Cochran's dissenting opinion in *Watson v. State*, 204 S.W.3d 404, 448–50 (Tex. Crim. App. 2006), as outlining the proper application of a single evidentiary standard of review). "[T]he reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Id.* at 899.

Applicable Law

The State alleged that appellant, "with intent to terrorize Lance Hooser, intentionally or knowingly abduct[ed] Lance Hooser, while using or threatening to use deadly force, by moving him from one place to another with the intent to prevent his liberation." *See* TEX. PENAL CODE ANN. § 20.04(a)(5). Whether a person is charged as a primary actor or as a party to the offense, the underlying offense of aggravated kidnapping remains the same. *Hinojosa v. State*, 433 S.W.3d 742, 752 (Tex. App.—San Antonio 2014, pet. ref'd). One way in which a person commits the offense of aggravated kidnapping is by intentionally or knowingly abducting another person with the intent to terrorize the abducted person or a third person. *See* TEX. PENAL CODE ANN. § 20.04(a)(5). For purposes of this statute, "'abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *See id.* § 20.01(2) (West 2011). "'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). Restraint is "without consent" if "accomplished by force, intimidation, or deception." *Id.* § 20.01(1)(A); *Hinojosa*, 433 S.W.3d at 752.

Analysis

Appellant maintains that he was unaware of the presence of a deadly weapon. However, a deadly weapon element was not part of the offense alleged. The use of *deadly force* was alleged as a necessary component of the element of "abduct," as that

7

term is defined in the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 20.01(2)(B) (defining "abduct" as restraining a person with intent to prevent his liberation by using or threatening to use deadly force). That said, we need not address the sufficiency of the evidence as it relates specifically to the presence or use of a deadly weapon.

Appellant also emphasizes that he had left the scene before Burns shot Hooser and adds that he did not directly participate in any of the violence done to Hooser prior to him being shot, seemingly in an effort to undermine the State's evidence on the use-of-deadly-force element. Indeed, the record would seem to confirm those facts. But it also reveals more about appellant's role in the incident. Appellant characterizes his participation in lifting Hooser's shoulders as he was being carried to the car as his attempt to prevent any more harm to Hooser by being dropped. He minimizes his participation and claims to have remained outside the house during the entire time. He claims to have gone over to the house for the purpose of simply meeting up with friends and, when one of those friends asked him for some rope or wire, appellant retrieved some speaker wire from his truck and "gave it to his buddy."

This characterization of the evidence defies common sense and ignores important pieces of evidence. We know from the recorded phone conversations that appellant sought revenge against Hooser for the truck and methamphetamine deal gone bad. By his own admission, appellant went to the house on Tennessee Street knowing that the plan was to beat up Hooser, to "rough him up" and "scare him." Further, he reported to Bralley when he returned to the pickup that he had heard Hooser scream inside the house. In fact, in his own statement to police, appellant acknowledges that he was aware that Hooser was being beaten and threatened, having recalled hearing

8

the suggestion that the group "cut off his balls."  Appellant also retrieved wire from his truck as all this was happening, making highly implausible his characterization of getting the wire to simply and blindly accommodate the request of "his buddy."  To the contrary, the evidence suggests that appellant tried, but was unable, to cut the wire into pieces more appropriately sized to bind Hooser's hands and feet.  The wire was ultimately used to wrap around Hooser's neck so tightly that heavy duty wire cutters had to be used to remove the wire at the autopsy.  He was directed to stand outside to make certain that no one was aware of the events taking place inside and agreed to go along with the further beating once the group left the house with the beaten and bound Hooser having been placed in the car.  The record shows that appellant, at least, knew of the plan, knew the plan was being executed, and participated in that execution.

Evidence that appellant went to the house on Tennessee Street to serve as a lookout, that he heard the beating and the screaming, that he retrieved wire from his truck when members of the group requested stronger material with which to bind Hooser, that he helped to carry Hooser and lift him into the car to be taken elsewhere for further assault, and that appellant sought further involvement by expressing a desire to accompany the group out to the country to continue the assault on Hooser all suggest that he participated in the abduction—using deadly force to restrain Hooser with intent to prevent his liberation—such that he became liable for aggravated kidnapping either as principle or as a party.  At a minimum, he assisted in and facilitated the abduction and assault of Hooser by serving as a lookout, assisting in the carrying of Hooser, and retrieving binding material to use on Hooser.  The evidence is sufficient to support

appellant's conviction for aggravated kidnapping. We overrule appellant's sixth point of error claiming the contrary.

Charge Error: Law of Parties

In a related point of error, appellant contends that the trial court erred by permitting appellant to be tried for aggravated kidnapping under the law of parties. Though appellant couches his contention in terms of admission of evidence, we understand his issue to be one complaining of the trial court's inclusion in its charge to the jury an instruction on the law of parties as provided in Section 7.02 of the Texas Penal Code.

<u>Standard of Review</u>

When presented with a jury charge complaint, we review the charge under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (en banc). Under *Almanza*, we must first determine whether error exists in the charge and, if we find error, whether such error caused sufficient harm to compel reversal. *See Ngo v State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (en banc). Jury-charge error requires reversal when the defendant has properly objected to the charge and we find "some harm" to his rights. *Id.* at 743. When the defendant fails to object or states that he has no objection to the charge, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *Id.* at 743–44.

<u>Applicable Law</u>

The Texas Penal Code addresses party liability with the following provision:

10

(a) A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

(b) Each party to an offense may be charged with commission of the offense.

(c) All traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice.

TEX. PENAL CODE ANN. § 7.01 (West 2011). And from the following provision, we learn one set of circumstances under which a person may be responsible for an offense committed by the conduct of another:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

. . .

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]

*Id.* § 7.02(a)(2) (West 2011).

Generally, the trial court may instruct the jury on the law of parties if "there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Hinojosa*, 433 S.W.3d at 752 (quoting *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999)). "In determining whether the accused participated as a party, the [trial] court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (en banc) (op. on reh'g) (quoting *Cordova*

*v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). Mere presence alone without evidence of intentional participation is insufficient to subject a defendant to party liability. *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985). Circumstantial evidence may be used to prove party status. *Ransom*, 920 S.W.2d at 302. When the evidence is sufficient to support both primary and party theories of liability, the trial court does not err in submitting an instruction on the law of parties. *Id.*

Analysis

Here, the evidence is sufficient to support the submission of a party liability theory instruction to the jury. We have outlined the evidence of appellant's direct participation in the aggravated kidnapping of Hooser and have found such evidence sufficient to support his conviction for aggravated kidnapping. To this we add that the recorded phone call between Young and appellant suggests that appellant promoted or encouraged the act, demonstrating that appellant acted with the requisite "intent to promote or assist the commission of the offense." Certainly, by serving as a lookout, retrieving stronger binding material, helping to load Hooser into the car, and agreeing to participate in further retribution when the group planned to take Hooser out into the country, appellant, at a minimum, encouraged, aided, or attempted to aid the other members of the group in the aggravated kidnapping of Hooser. After, it seems, appellant learned that Hooser had been killed, he directed Young to burn the car the group had used to transport Hooser.

This is not a matter in which appellant was merely present. He participated in the aggravated kidnapping in the role and in the manner designated by the group carrying

out its plan such that his participation would subject him to liability as either a principal or as a party. Because the evidence is sufficient to support either theory of his liability, the trial court did not err by instructing the jury on the law of parties in a manner consistent with Sections 7.01 and 7.02 of the Texas Penal Code. *See Ransom*, 920 S.W.2d at 302. We overrule his fifth point of error.

## Remaining Points of Error Generally

Appellant objected on several grounds several times during trial of the trial court's admission of evidence that Hooser was ultimately murdered on August 12, 2013. On appeal, appellant maintains his position that such evidence was irrelevant and prejudicial and that its admission was harmful to appellant. In his first through fourth points of error, he attacks the admission of evidence relating to Hooser's murder on several fronts, each of which we will address in turn.

## Denial of Motion in Limine

In his first point of error, appellant contends that the trial court erred when it denied and refused to hold a hearing on appellant's motion in limine. In his argument on this issue, he identifies the evidence of Hooser's murder as irrelevant and prejudicial. He goes on to take the position that the trial court's denial of his motion in limine was harmful.

A trial court's grant or denial of a motion in limine is a preliminary ruling only and normally preserves nothing for appellate review. *Geuder v. State*, 115 S.W.3d 11, 14-15 (Tex. Crim. App. 2003). A separate trial objection must be made at the time the

13

evidence is offered for admission. *See id.* at 15; TEX. R. APP. P. 33.1(a). In this case, appellant did make several trial objections relating to the admission of evidence that Hooser was ultimately murdered, objections that will permit us to reach the merits of his contentions through his other points of error. However, this particular issue concerning appellant's motion in limine presents us nothing for appellate review, and we overrule it.

## Photographic Evidence

In his second and third issues presented, appellant complains of the trial court's admission into evidence the photographs depicting Hooser's body when Hudson arrived at the scene and during his autopsy. Though the heading of his third issue suggests that it is directed at the "cumulative nature" of the photographs, the law cited in the ensuing development of the issue and his argument in support of it are largely the same as those advanced in his second issue. He contends in both points that the trial court erred by admitting the photographs because their prejudicial effect outweighed their probative value in a trial for aggravated kidnapping.

Standard of Review and Applicable Law

The admissibility of photographic evidence lies within the sound discretion of the trial court. *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006). Its decision to admit or exclude evidence will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 787. The Texas Rules of Evidence favor admission of all relevant evidence at trial, though these evidentiary rules do provide exceptions that would exclude otherwise relevant and admissible evidence. *See* TEX. R. EVID. 401.

14

One exception to this general rule is found in Rule 403: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. When called on to analyze evidence in light of a Rule 403 objection, the trial court must balance the following considerations: (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

When dealing specifically with photographic evidence, we also consider the number and size of the photographs, whether they are in color or black and white, the detail shown in the photographs, whether the photographs are gruesome, whether the body is naked or clothed, and whether the body has been altered in some way that might enhance the gruesomeness of the photographs to the appellant's detriment. *Shuffield*, 189 S.W.3d at 787. Simply because the photographic evidence depicted the "disagreeable realities" of the crime, does not render it inadmissible: "[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done[,] we cannot hold that the trial court has abused its discretion merely

15

because it admitted the evidence." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (en banc).

Analysis

The photographs are not overwhelming in number; there are five showing Hooser lying in the street, one of which shows Hooser's body at an intermediate distance showing its position and context; two of which focus solely on the binding evident on Hooser's wrists and feet; one which shows the ligature marks and, inevitably, the other injuries to Hooser's neck and head; and one the details of which are difficult to make out in our copy other than to say that it appears to show the scene including housing and vehicles.[3] The twenty-one photographs from the autopsy are primarily medical in character. We see Hooser's body photographed lying on the examination table. Most of the photographs are directed at the wounds caused to Hooser's body, including the binding both before and after removal of the tape and wire. Many also include a ruler that provides the size of the particular wound being depicted. These photographs, too, are unpleasant to view, but no more so than one would expect when viewing photographs of another human being who died after being brutalized. Again, these particular images have a more clinical tone and serve to demonstrate the method of

---

[3] The lack of clarity of our copy of the photograph—State's Exhibit 5—permits us only to determine that it depicts the scene after Corporal Hudson arrived. We can see houses and a police car and can determine generally that some of the street is also shown. At that point, however, the photograph becomes very dark, and we are unable to tell whether the photograph also includes what would be another intermediate-distance image of Hooser's body lying in the road. The discussion at trial of this particular photograph could be read to suggest that it does. We can gather from the available context that images of Hooser's body would be seen at a fair distance and would not be particularly gruesome beyond the ordinary discomfort the image of a dead body in a residential street invokes in people of ordinary sensibilities.

binding Hooser's neck, feet, and hands and the number, extent, and relation of the injuries he sustained during the ordeal.

The non-photographic evidence supports the conclusion that appellant promoted, assisted, and sought further participation in the aggravated kidnapping of Hooser. We also learn that he directed post-murder actions as it relates to Hooser's kidnapping. So, although we do agree that the record would support the conclusion that appellant did not directly participate in the actual physical acts taken on Hooser's person, we cannot say that his promotion and participation were irrelevant to the ultimate outcome; his participation in the aggravated kidnapping did contribute to the physical assault and murder of Hooser such that the photographic evidence—though depicting an unpleasant reality—was not more prejudicial than probative. We overrule appellant's second and third points of error.

All Evidence of Hooser's Murder

In a related contention, appellant complains of all the evidence relating to the fact that Hooser was ultimately murdered, pointing again to the evidence that appellant was not at the scene when Hooser was murdered and re-emphasizing that appellant was charged with aggravated kidnapping of Hooser—not his murder.

Standard of Review and Applicable Law

We review the trial court's admission of evidence for an abuse of discretion and will not disturb the trial court's decision if the ruling was within the zone of reasonable disagreement. *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008).

As outlined in our analysis of appellant's second and third issues, one exception to the general rule favoring admission of relevant evidence is found in Rule 403: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. When called on to analyze evidence in light of a Rule 403 objection, the trial court must balance the following considerations: (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42.

Concerns regarding relevance and prejudicial effect often arise when dealing with "same transaction contextual evidence." *See Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (en banc). Such evidence imparts to the trier of fact information essential to understanding the context and circumstances of events which, although legally separate offenses, are blended or interwoven. *Id.* That being so, it is admissible to illuminate the nature of the crime alleged. *Id.* Same transaction contextual evidence becomes an issue when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand. *See Rogers v. State*, 853 S.W.2d 29,

18

33 (Tex. Crim. App. 1993) (en banc) (op. on reh'g). "It is well settled that where one offense or transaction is one continuous episode, or another offense or transaction is a part of the case on trial or blended or closely interwoven therewith, proof of all the facts is proper." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986) (en banc) (quoting *Mitchell v. State*, 650 S.W.2d 801, 811 (Tex. Crim. App. 1983) (en banc)). Such evidence is treated as "'intrinsic'—a circumstance of the defendant's charged criminal act." *Worthy v. State*, 312 S.W.3d 34, 40 (Tex. Crim. App. 2010).

Analysis

Hooser's murder and aggravated kidnapping are factually interwoven. The binding, the beating, the transportation, and the murder are all part of the details surrounding the plan to exact revenge on a man who had crossed others in the methamphetamine business. In fact, to prove aggravated kidnapping as charged, the State had to prove that appellant, as principal or party, abducted Hooser while using or threatening to use deadly force. Evidence relating to the injuries sustained by Hooser, including the fatal ones, is relevant to show the deadly force element of the offense. Certainly, evidence that Hooser was ultimately killed shows that, during the course of kidnapping Hooser, the group utilized deadly force.

That appellant did not personally inflict those injuries does not relieve him of criminal liability in light of his knowledge and promotion of the kidnapping and assault and his assistance and participation in the commission of those offenses. The jury was entitled to hear the tragic, albeit not unsurprising, outcome of the brutal assault of the kidnapped man because Hooser's murder during the aggravated kidnapping was so

19

intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete. *See Rogers*, 853 S.W.2d at 33. Evidence that Hooser was ultimately murdered imparted to the jury information essential to understanding the context and circumstances surrounding the aggravated kidnapping. *See Camacho*, 864 S.W.2d at 532. And, even though murder is a legally separate offense, the aggravated kidnapping and the murder of Hooser are blended and interwoven events in the incident occurring on August 12, 2013. *See id.* That being so, evidence that Hooser was killed at the end of the transaction is admissible to illuminate the nature of the crime alleged. *See id.*

We add that both appellant and the State seemed to make clear at trial that appellant was charged with aggravated kidnapping and that others in the group were personally responsible for the actual murder of Hooser. Also, the trial court's charge to the jury was clear that appellant was being charged with aggravated kidnapping. That being so, we do not see that the jury could be confused on the matters on which it was charged. *See Gigliobianco*, 210 S.W.3d at 641–42. We overrule appellant's fourth point of error.

## Conclusion

Having overruled appellant's points of error on appeal, we affirm the trial court's judgment of conviction. *See* TEX. R. APP. P. 43.2(a).

Mackey K. Hancock<br>
Justice

Do not publish.

20